UNITED STATES of America, Plaintiff-Appellee,

v.

Norman IRVIN, Charlie Surles, Defendants-Appellants.

No. 82–7328.

United States Court of Appeals, Eleventh Circuit.

July 24, 1984.

N.P. Callahan, Jr., Birmingham, Ala., for Irvin.

Thomas H. Figures, Asst. U.S. Atty., Mobile, Ala., for plaintiff-appellee.

Before RONEY and VANCE, Circuit Judges, and SIMPSON, Senior Circuit Judge.

SIMPSON, Senior Circuit Judge:

The Orrville, Alabama, branch of the First Dallas County Bank, a bank whose deposits are insured with the Federal Deposit Insurance Corporation (F.D.I.C.) was robbed between one and two o'clock on the afternoon of September 13, 1978. The robbers took over Seventy-eight Hundred Dollars from the cash drawers, purses belonging to the two tellers on duty and a twenty-

two caliber revolver. None of the cash or property was ever recovered. Three defendants were each charged with one count of robbery of a federally insured bank in violation of 18 U.S.C. §§ 2 and 2113(a) and one count of assault with a deadly weapon in the commission of the robbery in violation of 18 U.S.C. §§ 2 and 2113(d). One defendant was acquitted by the jury. Defendant Irvin received a single fifteen year sentence for conviction on both counts. Defendant Charlie Surles received a single ten-year sentence for conviction on both counts. Both men appeal their convictions.

Surles raises only one issue: whether the evidence was sufficient to overcome his motions for judgment of acquittal and sustain the jury verdict. In resolving this question, we must view the evidence in the light most favorable to the government, and draw all reasonable inferences and resolve all credibility choices in favor of the trier of fact. *United States v. Pablo-Lugones,* 725 F.2d 624, 625 (11th Cir.1984).

The robbery was committed in approximately three minutes by a gunman who pointed a revolver at the two female tellers on duty, and a second man the tellers could hear but did not see. The gunman told the tellers to lie on their stomachs with their hands behind their backs. After the tellers had complied, the robbers bound their hands with chains secured by knots and locks. The gunman and his accomplice then emptied the cash drawers. While the robbery was in progress, Daniel Dixson, a customer, walked into the bank. The robbers ordered him to join the tellers on the floor and fled shortly thereafter.

One of the tellers described the gunman as standing six feet tall and weighing between 145–150 pounds. Though a navy blue ski mask, dark clothing and gloves concealed most of the gunman's features, the teller could see Negroid skin through the eye openings in his mask. A bank customer who had used a drive-up window shortly before the robbery testified that she had seen two black men sitting in a white pickup truck outside the bank. At trial she identified Irvin as a bearded man she had seen in the truck.

Irvin, a black man, is approximately six feet tall. (His weight does not appear in the trial record.) Though he was clean-shaven at trial, he wore a beard at the time of his arrest.

Odell Solomon had been sitting outside the bank and eating his lunch while he waited for Dixson to finish his banking. He testified that he had seen two men wearing dark blue caps come out of the bank. The first man made a hand movement toward his waistband ("... like he was pulling up his pants...") as he stepped out of the door. The second man was carrying a garment bag. Both men entered a white pickup truck and drove away. Solomon later identified a white truck which was found approximately five miles from the bank near the intersection of county roads three and eleven as the escape vehicle. The truck had been stolen on the previous night from a company that had fired Irvin approximately one month before the theft. From its surface, investigators lifted a fingerprint and palmprint later identified as belonging to Norman Irvin. The fingerprint expert who lifted the latent prints testified that it would be extremely difficult to lift a 30 day old latent fingerprint of a quality equal to the prints found on the truck surface.

A merchant testified that two black males entered his store on a day preceding the robbery and asked to buy some chain but left the store without making a purchase. The merchant identified Norman Irvin as one of the two men.

A rural mail carrier testified that she saw a brown and beige car with a citizen's band radio antenna parked near the intersection of county roads three and eleven at approximately 1:00 o'clock on the afternoon of the robbery. Though she initially described the car as a Chevrolet Monte Carlo, after viewing a group of photographs of divers automobiles of a similar size and style, she identified the brown and beige Chrysler Cordoba that Charlie Surles had owned at the time of the robbery. The

initial photographic identification was later verified by a personal view of the Cordoba.

The government's strongest witness was William Belser, a cousin of Norman Irvin's who had known Charlie Surles for two and a half years. Belser testified that Irvin had asked him to assist in robbing the First Dallas County Bank in Orrville, Alabama. Irvin informed him that the robbery would be easy because there were no male employees and revealed his plan to steal his former employer's truck by using a key he had kept after his dismissal. On the evening before the robbery, Irvin appeared at Belser's home driving the stolen truck and showed him chains and locks that he had bought to use in the robbery. The night after the robbery, Irvin returned to Belser's house and showed him a large wad of bills while bragging, "I told you it would be easy." Two days later, Belser saw Charlie Surles who told him that he was angry that he had received too small a sum for his participation in the robbery. Surles informed him that he had "cased" the bank and had served as the "switch-up man".[1]

Surles argues that the testimony of Belser and the mail carrier was insufficient to convict him because the carrier was initially confused as to the manufacturer of the automobile and because Belser was totally lacking in credibility. As stated above, our standard of review requires the resolution of all credibility choices in favor of the verdict. Consequently, we find the evidence sufficient.

Irvin raises four issues on appeal: 1, He received ineffective assistance from counsel and was, consequently, denied a fair trial; 2, The court committed error in allowing the introduction of hearsay testimony; 3, The court committed plain error in allowing a co-defendant to elicit from William Belser that Irvin had been convicted of and sentenced for a previous bank robbery and had participated in other bank robberies and, 4, The trial court abused its discretion in limiting cross-examination of a witness who had testified in his favor, when that witness was later called by a co-defendant.

■ We will not review Irvin's allegations of ineffective assistance of trial counsel. The claim was not raised in the district court other than by a pre-trial affidavit of his counsel which was ignored by the trial judge, and there has been no opportunity to develop and include in the record evidence bearing on the merits of the allegations. *U.S. v. Carter*, 721 F.2d 1514, 1537 n. 32 (11th Cir.1984).

Because Irvin's attorney failed to make a contemporaneous objection to the introduction of hearsay evidence and evidence of extraneous crimes, this court may review the record for plain error only. *United States v. Chilcote*, 724 F.2d 1498, 1502 (11th Cir.1984), cert. denied —— U.S. ——, 104 S.Ct. 2665, 81 L.Ed.2d 370 (1984). "Plain error consists of error which, when examined in the context of the entire case, is so obvious that the failure to notice it would seriously affect the fairness, integrity and public reputation of the judicial proceedings". *Id.* at 1053 quoting from *United States v. Russell*, 703 F.2d 1243, 1249 (11th Cir.1983). We find that the evidence of which Irvin complains fails to meet that standard.

■ The purported hearsay identified in the brief is contained in the testimony of Gary Clem, a special agent of the Federal Bureau of Investigation who testified after Odell Solomon was unable to identify Irvin as one of the two men that he saw leaving the bank. During cross-examination, Solomon testified that he had made no previous identification either in person or by examination of a spread of photographs provided by the government. He did admit that he had seen "a hound's face of similarity", between one of the pictures in a photographic spread and one of the men. During redirect examination Solomon admitted that he had received a couple of threaten-

---

**1.** From the testimony, it is apparent that a "switch-up man" is one who provides escaping robbers with a second automobile in order to allow them to abandon a vehicle which might be identified by robbery victims and other witnesses.

ing telephone calls after having given investigating officers some information but explained that the threats had no effect upon him. Clem was then called to testify that Solomon had selected Irvin's picture from a photographic spread and that he "became aware" that Solomon had received threatening telephone calls after making the identification but he had made no investigation of the matter. The admission of this testimony was clearly not plain error.

The hearsay rule covers only those out of court statements which are offered "to prove the truth of the matter asserted." Fed.R.Evid. 801(c). Clem's testimony concerning the photographic spread was offered to prove the fact that Solomon had made a prior identification rather than the identity of the men that he saw leaving the bank. Therefore, the testimony falls outside the scope of the hearsay rule. *United States v. Pate,* 543 F.2d 1148, 1149 (5th Cir.1976). If there was any violation of the hearsay rule in admitting testimony that Clem "became aware" that Solomon had been threatened, the error was clearly harmless. Solomon had previously testified without objection that he had received threats. None of his testimony, which was, in part, beneficial to Irvin's defense, has been challenged on appeal.

■ Nor do we find plain error in the admission of evidence of "other crimes". The testimony was elicited in Surles' cross-examination of William Belser. Surles' counsel attempted to discredit Belser's testimony and solicit the jury's sympathy by getting him to admit, *inter alia,* that he had testified for the government in other bank robbery trials, that some of the defendants against whom he had testified had been acquitted, and that one of the acquitted defendants had violently committed suicide after his trial. Unfortunately for Irvin, Surles' attorney asked Belser an open-ended question which allowed him to testify that Irvin had been convicted of bank robbery and received a sentence of imprisonment for his conviction.[2] When Surles' attorney pressed further, the government objected to the relevance of Irvin's record of acquittals and convictions.[3]

The court then allowed Surles to proceed with the cross-examination. Nevertheless, in redirect examination, the prosecutor inquired, without objection, whether Belser had testified in another trial involving Irvin. When he inquired whether Irvin had been convicted, Surles' counsel objected before Belser could give an affirmative answer.[4] The court made no ruling and the

2. Q. You made some disclosures about some other bank robberies, too, didn't you, this ain't the only one and the one you were involved in and you made disclosures on some other cases, too, did you not?
A. Yes, sir.
Q. And you involved some other and different people than the ones here today, isn't that also true?
A. Yes, sir.
Q. What was the result of your testimony in those cases?
A. I got some time out of one of them and I think Mr. Irvin got some time out of one of them.
Q. What about the other people you tried to involve?
A. The other person is deceased.
Q. The man that lived out there on the old Selma Road is deceased?
A. Yes, sir.
Q. He was not deceased at the time of the trial though, was he?
A. No, sir.
Q. What happened to him?

A. He blew his brains out.
Q. What happened to him at the trial?
A. He was acquitted, I think.
Q. And that [sic] was your testimony the same in that case as is in this one you are involving somebody else in a bank robbery, isn't that true?
A. Yes, sir.

3. Mr. Figures: Judge, I object to the form of the question and I also object to the relevance of this.
I don't see where these other bank robberies wherein Mr. Irvin was convicted and Mr. Irvin was acquitted has [sic] any relevance to the proceedings before the Court today.
Mr. Smith: What I'm trying to say is that this man pointed his finger at a half a dozen different people and not only these two sitting here in other cases.
THE COURT: Go ahead. Go ahead.

4. Q. Mr. Smith also brought out in his questioning of you that you have testified in other proceedings in which Mr. Irvin is a defendant, is that right?

question was neither repeated nor answered. Though the prior convictions were inadmissible under Rules 402 and 404(b) of the Federal Rules of Evidence, we decline to find plain error.

As we have already stated, the question whether Irvin was represented by constitutionally adequate counsel must be addressed first in district court. When Irvin's attorney did not object or ask for a mistrial and severance of defendants' cases, the trial judge was left with a difficult decision. If the court restricted Surles' cross-examination of Belser, the strongest witness against him, it could have denied him a fair trial. On the other hand, a *sua sponte* severance and mistrial, or a ruling striking the evidence may have overridden a tactical decision to call no further attention to the objectionable evidence and to go forward with the trial. Under the circumstances, such a tactical decision would not be necessarily devoid of reason.

The strongest case that the government had was its case against Irvin. His co-defendants were never identified in court or linked to the physical evidence by fingerprints. Surles, the co-defendant who testified, had no record of arrests or convictions. More than one defendant has benefited from a jury whose passions have been aroused by the arrest, indictment and trial of co-defendants against whom the government has committed a supposed injustice by arresting and trying them upon insufficient evidence. Surles' cross-examination of Belser attempted to arouse such feelings in the minds of the jurors. Unfortunately for Irvin and Surles, the jury did not completely discredit the direct testimony. Given the circumstances, we cannot hold that the trial judge committed plain error. As we have stated above, the competence of defense counsel is a matter that must be explored by the district court after affording all parties an opportunity to present evidence.

 Finally we find no erroneous limitation on Irvin's rights of cross-examination. Irvin's attorney called Loveless Belser as a witness in an attempt to discredit the testimony of his brother William Belser. After Loveless had completed his testimony, Surles called Loveless as his witness and, after laying the proper predicate, asked him to state William's reputation for veracity in the community. Loveless replied, "Bad". During the government's cross-examination Loveless admitted that he had been convicted of a felony. Irvin's attorney then attempted to examine Loveless concerning matters which concerned neither William's reputation nor his prior conviction. The government objected that the examination exceeded the scope of the preceding examination. We agree. A trial court may properly limit cross-examination to questions eliciting relevant evidence. *United States v. Gray*, 730 F.2d 733, 736 (11th Cir.1984).

Having found no reversible error, we AFFIRM the judgment of the district court.

A. Yes, sir.
Q. And others were defendants, is that right?
A. Yes, sir.
Q. And Mr. Irvin, as Mr. Smith brought out, was convicted, is that right?
 Mr. Smith: I object to that. I did not bring that out at all.

THE COURT: You asked the question and he answered.
MR. SMITH: I wanted to correct Mr. Figures over here who said it. I did not say it.
Q. And you testified in that proceeding, didn't you?
A. Yes, sir.